THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* HAROLD ROBINS and Another, Appellants.

First Department, December 7, 1934.

*Abraham Abramowitz,* for the appellant Harold Robins.

*Louis Glickhouse,* for the appellant Andrea Gras.

*Vincent A. Catoggio, Jr., Deputy Assistant District Attorney,* of counsel [*William Copeland Dodge, District Attorney*], for the respondent.

TOWNLEY, J. During the strike of the Amalgamated Food Workers Union, the complainant Bonnofoux was assaulted by five men near his home on West Thirteenth street in the city of New York. The assault took place on February 15, 1934, at six A. M. As a result he suffered a temporary collapse and subsequently lost

an eye. Bonnofoux is sixty-eight years old and was a non-union baker, working in the Downtown Athletic Club. After the assault he told detectives that on the night of Monday, the twelfth of February, two men had called on him and had requested him to go to union headquarters. Bonnofoux said he had refused. Bonnofoux also said that he recognized two of the men who assaulted him as the men who had visited him on the night of the twelfth. He finally identified the defendants Robins and Gras as the men who had called upon him. He had some difficulty in identifying Gras, though Gras had worked in the same kitchen with him for six months. Bonnofoux was the only witness who claimed to identify the defendants.

The defenses were alibis. Gras says that on the morning of the assault he slept until eleven A. M. A witness named LeRoy testified that he went to Gras' house to get him up that day. Robins also claimed that he did not arise on the morning of the assault until eleven o'clock and had not previously gone out of the house at any time. The witness Friedman testified that he slept in the same room with Robins on the night of the fourteenth and that Robins was still there when he left for work at about eight-fifteen A. M.

For several days after the assault the complainant, Bonnofoux, was not able to give the name of any of his assailants. He did not claim to have recognized Gras either on the occasion when he visited his house or on the occasion of the assault. He first claimed to be able to identify him after a conversation on February eighteenth with the boss chef from the Downtown Athletic Club, who called on him at the hospital. He testified that the name of Gras was mentioned in the course of the conversation as having been arrested on a charge of striking a policeman in the club and that after the chef had left he suddenly realized that Gras was one of the men who had called on him on February twelfth and who had assaulted him on February fifteenth. Bonnofoux's explanation of why he had difficulty in identifying Gras was that whenever he had seen Gras in the kitchen, Gras was dressed in white like other cooks, whereas in the visit to his house at the time of the assault he was dressed in black. From this statement it is obvious that a close question of fact was litigated in this case, and that the identification of the defendants, particularly of Gras, was open to serious doubt.

The appellants claim that the evidence did not warrant a conviction, and they urge that defendants did not have a fair trial because of the errors of the learned trial justice. After fully considering the case, we are of the opinion that these errors were

material. They involve unreasonable interference by the court in examination of witnesses, prejudicial remarks of the court during the course of the trial and erroneous instructions to the jury.

Bonnofoux testified in the Magistrates' Court that at the time the defendants visited him they left, saying, in effect, " There is nothing to do with him; it is no use." At the trial his version of the conversation was: " There is no use with him, we will get him some other time." Naturally, the defendant pressed the cross-examination on this point as long as there was any hope of getting an admission of a contradiction or some explanation of the discrepancy in the testimony on this important point. The defendant's attorney finally said to the court concerning Bonnofoux, " He has not told us why he did not say it in the Magistrates' Court." Whereupon the following occurred: " The Court: There is no evidence to show that everything he said was taken down by the stenographer. Mr. Malmud: If the Court with the acquiescence and consent of the District Attorney does not accept these as the certified minutes I will subpœna the stenographer. Mr. Wasser: I do not question but that these are the certified minutes, but the minutes are not accurate, because I examined them. I won't concede their accuracy. The spelling is all wrong, everything is wrong in the Magistrates' minutes. I know what the Magistrates' Court stenographers do. The Court: So do I. I sat in the Magistrates' Court a number of years. Mr. Malmud: I do not suppose that this argument with the District Attorney was intended for the jury, but was intended to be addressed to the Court. Mr. Wasser: It is meant for your hearing. Mr. Malmud: If you want to talk to me you do not have to address the jury. The Court: Won't you proceed with this trial? You have had this man on cross-examination an hour and ten minutes this morning and almost the same length of time yesterday."

Bonnofoux's son Lucien was put upon the stand next, and on cross-examination the defendants' attorney attempted to establish just what his father's testimony had been in the Magistrates' Court. The court excluded the testimony as to what had transpired there, on the following grounds: " Q. Were you present at the Magistrates' Court hearing on March 8th? A. I was. Q. Did you hear these questions and answers put to your father and answered by him? Mr. Wasser: I object to that. I do not think that is the proper way. The Court: Objection sustained. You cannot ask one witness what somebody asked another witness. Mr. Malmud: Why not? The Court: Because that is the rule of law. Mr. Malmud: I wish to offer in evidence the fact that this complainant has contradicted himself; and I wish to prove it by

the witness. The Court: You cannot do it in that way. You have had about two hours cross-examining about those minutes. Mr. Malmud: That is all I have got to go on. The Court: You cannot ask this witness that question. His independent recollection of what he may or may not have heard in the Magistrates' Court. There is no reason to believe that he heard anything, or heard everything. I certainly will not allow testimony such as that. It is entirely improper. Mr. Malmud: Your Honor rules that I cannot from this witness obtain some contradictory statements? The Court: I don't know whether you can or not. You are assuming that if he testified, his statements would contradict. There is nothing to show that they would. But I have ruled that you cannot examine this witness about what his father said or what he heard his father say in the Magistrates' Court. You have the minutes there in your hand, and you examined the witness on those at great length."

On the theory of the learned trial justice not only were the minutes without any probative value but the sworn testimony of people who were present at the occurrence was also inadmissible. This ruling was contrary to any accepted legal doctrine. As long ago as Lord MANSFIELD's day, it was said in *Mayor of Doncaster* v. *Day* (3 Taunt. 262): " What a witness, since dead, has sworn upon a trial between the same parties, may, * * * be given in evidence, either from the judge's notes, or from notes that have been taken by any other person, who will swear to their accuracy; or the former evidence may be proved by any person who will swear from his memory to its having been given." Our own Court of Appeals, in *McRorie* v. *Monroe* (203 N. Y. 426, 430), has said: " At common law, whenever it was desired to prove the testimony given upon a former trial, it was always permissible to prove it by the recollection of any person who heard it and who would undertake to narrate it correctly." (See, also, *Johnson* v. *Powers*, 40 Vt. 611; *State* v. *McDonald*, 65 Me. 466.)

As a result of the ruling it was impossible for the defendants to impeach any of the testimony on this point given by Bonnofoux. The error was particularly harmful since it disabled the defendants from impeaching the only witness who connected them with the assault.

During the course of a discussion involving the admissibility of certain testimony offered by the defendants indicating, as it was claimed, that the defendants had been picked up by the police because they had recently been arrested together with three other men on a charge unconnected with this case, the following occurred: " Mr. Malmud: I am endeavoring to show that these defendants

are just only —— The Court: *Just victims of society.* Mr. Malmud: Oh, no, not at all. The Court: But there are only two defenses to assault. One is I did not do it; and the other is I did it in self-defense. You cannot show that by saying that this man was arrested for something else at some other time and place." (Italics ours.)

The sarcastic characterization of the defendants as "just victims of society" was entirely unnecessary and bound to result in prejudice to them.

During the cross-examination of a witness called to establish the connection of the defendant Robins with the union, it had been developed that Robins was not a member of the union and that he had been employed, at about the time when the strike began, to go to people's homes and solicit them to come down to union headquarters. After the district attorney had concluded his cross-examination, the court continued the examination, as follows: " By the Court: Q. I would like to know. When you were on strike a lot of people were out of work? A. Yes. Q. Well, why did you hire outside people who did not belong to the union instead of giving that to your own men? A. Because very often our own men are not qualified to do the same work. Q. Are not qualified to do what? A. In our particular case, different kind of filling out applications, great many questions. Q. When he was out visiting people, he did not fill out applications? A. I said that was only part of the work. He did not do all that, he did not do that entirely. He did other work, too."

The plain import of this cross-examination was to indicate to the jury the court's opinion that Robins had been employed as a strong arm man to compel people to join the union. This is clearly shown to be the understanding of the district attorney who after the examination by the court resumed his cross-examination, and in connection therewith asked the following questions: " Q. Listen to this question: As a matter of fact, wasn't he used for strong-arm purposes? A. He was not. Q. Do you know what strong-arm purposes are? A. Yes, I do."

There were many errors in the court's charge of which the following only need be considered here. In relation to the defense of alibi, the court charged: " The defense in this case is what is known as an alibi. An alibi is a defense interposed by a person accused, to the effect that he could not have committed the crime, because at the time the crime was committed he was not at the place of the crime but somewhere else. Of course, it is obvious, that an alibi, if true, is a perfect defense. There is no question about that. Nobody could truthfully say that you

met somebody at the Grand Central Station while I am charging you gentlemen at 5:35 this afternoon. On the other hand an alibi is, by the nature of things, an easy defense to make up. Sometimes you can get all the circumstances in circumstantial detail, if you simply shift the date, or put it an hour or two ahead, or a day or two ahead or a day or two after. So a jury is justified in looking upon an alibi with a certain degree of suspicion, before they are assured that it is a truthful one."

The defense of alibi in contemplation of law does not differ from any other defense. If the evidence to support it is sufficient, the defendants are entitled to have it accepted. They should not be put to the disadvantage of not only establishing their defense but at the same time overcoming a suspicion engendered in the minds of the jury by the judge. In *People* v. *Barbato* (254 N. Y. 170) the court in its opinion (at p. 179) said: "If the proof as to an alibi, when taken into consideration with all the other evidence, raises a reasonable doubt as to defendant's guilt, he is entitled to an acquittal."

In *People* v. *Kelly* (35 Hun, 295) the instruction given the jury was: "An alibi is a species of defense which the law looks upon generally with great suspicion." In reversing the conviction, the court said: "It is proper for the jury to scan with care the testimony given, for the purpose of determining whether it is true or false, but we do not understand that the law regards the defense as a suspicious one. On the contrary, the defense is as honorable, and when clearly proved, as satisfactory, as any defense which the law permits."

The prejudice resulting to the defendants from the erroneous instructions given the jury on this subject was serious. It deprived them of an unbiased consideration of their sole defense.

Further on in the charge the court made the following argument in support of the credibility of the chief witness for the prosecution: "I may point out — and I think this is entitled to some consideration — that if Bonnofoux had been vindictive, and willing to charge people whom he did not believe were guilty — in other words, if he were lying for revenge, instead of saying what he believed to be true, it would be just as easy for him to say that he could identify five instead of two. But he did tell the police officer in the beginning of the case that of the five people who attacked him, he could identify only two who were at his house on the Monday preceding."

Later on the court took up an analysis of the witnesses for the defense as follows: "And then you have the witnesses for the defense who testify. There was some discrepancy in their testi-

mony. Two of them said they went to a place on the East Side, and another one said they went to a place on the West Side. Schwimmer said that he went between twelve and two o'clock. The other witnesses placed the visit at the time it probably occurred, at five o'clock. All the witnesses except Schwimmer agree that it was at five o'clock. You may consider from that whether or not Schwimmer was there at all. He said that he was certain it was between twelve and two. Raphael and Schwimmer said they went on East 13th Street whereas as you know Bonnofoux lives in West 13th Street. But Robins and Davila said they went to West 13th Street." It is true that these discrepancies did exist but there were very serious discrepancies in the testimony of the prosecution's witnesses which were not discussed at all by the court. A similar analysis of the latter might well have affected the verdict.

The jury after deliberating nearly five hours returned a verdict against both defendants " with a recommendation of leniency for the defendant Gras." The length of their deliberations and the recommendation with regard to the defendant Gras indicate that the jury had difficulty in determining the issue presented and emphasized the importance of the errors referred to.

The judgment should be reversed and a new trial ordered.

FINCH, P. J., GLENNON and UNTERMYER, JJ., concur.

MERRELL, J. (concurring). I concur for reversal upon the sole ground that the court improperly excluded evidence of witnesses as to what occurred in the Magistrates' Court. The evidence was competent. I regard the other alleged errors too trivial to require a reversal.

Judgment reversed and new trial ordered.